IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:20-HC-2206-FL

DUSTIN JAMAL WARREN,                    )
                                         )
                    Petitioner,          )
                                         )
        v.                               )                    ORDER
                                         )
WARDEN BARNEY OWENS,                     )
                                         )
                    Respondent.          )


        Petitioner, a state inmate proceeding pro se,[1] petitions this court for a writ of habeas corpus

pursuant to 28 U.S.C. § 2254.   The matter is before the court on respondent's motion for summary

judgment (DE 8) pursuant to Federal Rule of Civil Procedure 56.   Petitioner responded in

opposition, and in this posture, the issues raised are ripe for ruling.   For the reasons stated below,

the motion is granted.

                              **STATEMENT OF THE CASE**

        On September 9, 2014, petitioner was convicted following a jury trial in the Carteret

County Superior Court of one count of possession and distribution of a methamphetamine

precursor, one count of manufacturing methamphetamine, and one count conspiracy to

manufacture methamphetamine.   See State v. Warren, 244 N.C. App. 134, 139–41, 780 S.E. 2d

835, 839–40 (2015), cert. denied 368 N.C. 688, 781 S.E.2d 483 (2016).   The Carteret County

Superior Court consolidated the counts for possession and distribution of a methamphetamine

---

[1]     Prior to November 8, 2021, petitioner was represented by counsel.   However, that same day, the court
granted counsel's motion to withdraw.

precursor, and for manufacture of methamphetamine. <u>Id.</u>, 244 N.C. App. at 142, 780 S.E. 2d at 840. The court sentenced petitioner to 127 to 165 months' imprisonment on the consolidated judgment. <u>Id.</u> On the count for conspiracy to manufacture methamphetamine, the court sentenced petitioner to 127 to 165 months' imprisonment to be served consecutively to the consolidated judgment. <u>Id.</u> Petitioner appealed the judgments asserting the trial court erred by:

1. THE TRIAL COURT ERRED IN DENYING DEFENSE COUNSEL'S MOTION TO WITHDRAW BASED ON THE REASONS EXPLAINED TO THE COURT AND THUS DENIED THE DEFENDANT EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY THE UNITED STATES AND NORTH CAROLINA CONSTITUTIONS. . . .

2. THE TRIAL COURT'S DENIAL OF THE DEFENDANT'S MOTION TO CONTINUE TO ALLOW HIM TO SECURE WITNESSES FOR HIS DEFENSE DENIED THE DEFENDANT THE EFFECTIVE ASSISTANCE OF COUNSEL AND HIS DUE PROCESS RIGHTS AS GUARANTEED BY THE 5TH, 6TH, AND 14TH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND THE CONSTITUTION OF NORTH CAROLINA. . . .

3. THE DEFENDANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL WHEN THE TRIAL ATTORNEY FAILED TO REQUEST THE COURT BRING BRANDON ELPS FROM THE JAIL, AS THE COURT OFFERED, TO MAKE AN OFFER OF PROOF OF HIS TESTIMONY CONCERNING HEATHER KENNON GETTING HIM INTO TROUBLE AND THEN GOING TO LAW ENFORCEMENT AS THIS WAS THE THEORY OF DEFENDANT'S CASE ON TRIAL. . . .

4. THE DEFENDANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL BY NOT HAVING TWO WITNESSES BROUGHT BACK FROM THE DEPARTMENT OF CORRECTION TO TESTIFY TO HEATHER KENNON'S UNTRUTHFULNESS. . . .

5. THE TRIAL COURT DENIED THE DEFENDANT A FAIR TRIAL BY NOT GRANTING A CONTINUANCE AND THUS EXCLUDING NEGATIVE CHARACTER WITNESSES AGAINST HEATHER. KENNON AS THEY WERE AVAILABLE WITHIN THE DEPARTMENT OF CORRECTION AND NEED ONLY BE BROUGHT BACK BY THE STATE ON A WRIT. THEIR NEGATIVE TESTIMONY AS TO THE TRUTHFULNESS AND CHARACTER OF HEATHER KENNON WOULD HAVE SIGNIFICANTLY IMPEACHED

2

THE STATE'S CASE AND LIKELY RESULTED IN ACQUITTALS OF THE DEFENDANT. . . .

6. THE TRIAL COURT ERRED IN SENTENCING THE DEFENDANT AS A CLASS C FOR CONSPIRACY TO MANUFACTURE METHAMPHETAMINE WHEN THE FELONY IS A CLASS D. . . .

(Appellant's Brief (DE 1-4) at 2).[2, 3]   The North Carolina Court of Appeals found no error in part and dismissed in part.   Warren, 244 N.C. App. at 151, 780 S.E.2d at 845–46.   Petitioner appealed to the North Carolina Supreme Court on the grounds that:

1.   This case conflicts with the decision of the United States Supreme Court in Cuyler v. Sullivan, 446 U.S. 335 (1980), on a fundamental question of Constitutional law to wit, whether a declaration by trial counsel that he cannot be a "zealous advocate" on behalf of his client is evidence of a per se conflict requiring the Trial Court to grant the lawyer's motion to withdraw and permit Defendant a continuance to secure new counsel.   (N.C.G.S. § 15A-144).

2.   The decision of the Court of Appeals directly conflict with the decision of the United States Supreme Court in Massaro v. United States, 528 U.S. 500 (2003), on a fundamental question of Constitutional law; to wit, the right to effective assistance of counsel under the United States Constitution and the North Carolina Constitution (N.G.C.S. § 7A-31(a), (c)(3), Rule 15).

(Appellant's Pet. for Discretionary Review (DE 1-7) at 3–4).   The North Carolina Supreme Court denied discretionary review.   State v. Warren, 368 N.C. 688, 781 S.E.2d 483 (2016).   Petitioner filed a motion for appropriate relief ("MAR") in the state trial court on December 12, 2016. (MAR Ord. (D.E. 1-15) at 1100).   The MAR argues

movant was denied the effective assistance of counsel where trial counsel failed to prepare for trial, failed to request the trial court bring a witness in from jail to make an offer of proof concerning the state's chief witness Heather Kennon, and failed

---

[2]      Unless otherwise specified, page numbers specified in citations to the record in this order refer to the page number of the document designated in the court's electronic case filing (ECF) system, and not to page numbering, if any, specified on the face of the underlying document.

[3]      Petitioner's exhibit list skips "Exhibit 9."   This omission is not denoted on the electronic filing system. Accordingly, the court refers to the exhibits by the numbers assigned by petitioner.

3

to have two witnesses transported from the department of correction to testify to
Heather Kennon's truthfulness.

(MAR (DE 1-10) at 7). The trial court denied the motion, (id. at 1106), and the North Carolina
Court of Appeals denied petitioner's petition for discretionary review, (N.C. Court of Appeals
MAR Ord. (D.E. 1-17) at 1).

On October 27, 2020, petitioner filed the instant petition for a writ of habeas corpus
pursuant to 28 U.S.C. § 2254, alleging his state convictions should be vacated because: 1) "the
state court's determination that petitioner received effective assistance of counsel was contrary to
and based upon unreasonable application of clearly established supreme court precedent"; 2) "the
state court decision denying post-conviction relief was based upon an unreasonable determination
of the facts in light of the record evidence"; and 3) "the state court's determination that petitioner's
right to present a defense was not violat[ed]" was contrary to Supreme Court precedent and based
on an unreasonable factual determination. (Pet. (D.E. 1) at 24, 27, 35). In support of the petition,
petitioner attached 17 exhibits consisting of the following: 1) the record on appeal before the North
Carolina Court of Appeals; 2) transcript of the September 2, 2014, motion hearing; 3) criminal
trial transcripts from Carteret County Superior Court commencing September 8, 2014;
4) petitioner's appellant brief to North Carolina Court of Appeals dated May 13, 2015; 5) state's
brief to the North Carolina Court of Appeals dated June 15, 2015; 6) North Carolina Court of
Appeals decision filed November 17, 2015; 7) petitioner's petition for discretionary review dated
December 14, 2015; 8) state's response in opposition to petition for discretionary review dated
December 22, 2015; 9) North Carolina Supreme Court denial of discretionary review filed January
28, 2016; 10) petitioner's MAR dated December 8, 2016; 11) state's response to MAR filed
September 22, 2017; 12) Carteret County Superior Court MAR transcript dated July 6, 2018;

4

13) Carteret County Superior Court MAR transcript dated June 11, 2020; 14) Carteret County Superior Court order denying MAR dated July 21, 2020; 15) petition for writ of certiorari dated August 24, 2020; 16) state's response to petition for writ of certiorari dated September 3, 2020; and 17) North Carolina Court of Appeals denial of petition for writ of certiorari dated September 22, 2020. (See Pet. (D.E. 1) at 2).

Respondent filed the instant motion for summary judgment, on March 3, 2021, relying upon a memorandum of law, statement of material facts, and exhibits attached to the petition. Petitioner responded in opposition relying upon an opposing statement of material facts and exhibits attached to the petition.

## STATEMENT OF THE FACTS

The facts underlying petitioner's convictions, as recounted by the North Carolina Court of Appeals, are summarized below:

> Shortly before 12:00 p.m. on 29 January 2014, Defendant drove his gold Buick to the Seashore Motel in Atlantic Beach, North Carolina. Accompanying Defendant was Heather Kennon ("Kennon"), an acquaintance Defendant knew through his brother.
>
> Defendant pulled up to the motel office, Kennon alighted the car, and went into the office to register for a room. Scott Way ("Way"), the manager of the Seashore Motel, watched as Kennon alighted from the front passenger seat. Kennon filled out a registration card and paid for a room for the night. On the registration card, Kennon listed her name and the license plate of Defendant's gold Buick. Way accepted the registration and payment and gave her a key to room 9. After checking in, Way testified Kennon and Defendant stayed in the car for a "little while," and then proceeded into the room.
>
> Approximately two hours after checking in, Kennon returned to the motel office and asked for an extra space heater. Snow was on the ground that day, and it was very cold outside. Carla Thomas ("Carla"), an assistant manager at the Seashore

Motel, explained to Kennon the motel is old and another space heater would likely blow the circuit breaker.

Way brought extra blankets to room 9 and offered them in lieu of a second space heater. Way testified a man opened the door roughly two or three inches and "announced that they were in, you know, in—not decent," and did not want the extra blankets. Way testified he heard a male voice, and did not observe any males enter or exit room 9 except for Defendant.

The next morning, Way and Carla began the process of checking out guests and cleaning rooms previously rented. Around 9:00 or 9:30 a.m., Carla knocked on the door of room 9 to ascertain whether Kennon and Defendant needed anything or would like to register for another night.

After no answer, Carla announced her identity and that she was about to enter the room. Carla unlocked the door and entered the room. She noticed a black bag which contained, *inter alia,* a mask and a glue gun. Carla also noticed a pickle jar turned upside-down with a dried white reside at the bottom. After viewing the contents of room 9, Carla informed Way of her findings. Together, they determined the police needed to be summoned. Way called 911.

### A. Kennon's Testimony

Kennon testified that on 28 January 2014, she met Defendant at the DoubleTree Hotel in Atlantic Beach, North Carolina. Kennon and Defendant shared a room at the hotel, where they injected and inhaled methamphetamine, respectively. Defendant had already obtained the materials to make methamphetamine, with the exception of cold packs. Kennon and Defendant stopped by Cassie Flowers' ("Flowers") residence to obtain cold packs.

On 29 January 2014, Kennon accompanied Defendant to the Seashore Motel. After registering and paying for the room, Defendant parked the gold Buick in front of room 9. Kennon testified Defendant brought a black suitcase into the room, which contained the precursors to, and various supplies necessary to manufacture, methamphetamine. Defendant began removing the precursors and supplies from the suitcase and arranging them in preparation to make methamphetamine.

While Defendant prepared the supplies, Kennon injected herself with methamphetamine she had received from Defendant the previous day. Kennon attempted to assist Defendant in making methamphetamine. Defendant became dissatisfied with Kennon's assistance and manufactured the methamphetamine

6

alone, as Kennon looked on. Kennon testified the manufacturing process yielded approximately 4.5 grams of methamphetamine.

After Defendant finished, he left the supplies in room 9 at the Seashore Motel and they traveled to Anique Pittman's ("Pittman") residence. Pittman was Defendant's girlfriend. Kennon testified she, Defendant, Pittman, and Mark Thomas ("Thomas") drank beers, ingested methamphetamine, and spent the night. Kennon testified Defendant had the key to room 9 and intended to return to the Seashore Motel to retrieve the black suitcase and supplies prior to check out.

The next morning, Defendant left Kennon at Pittman's house to retrieve the materials left in room 9. Kennon testified while Defendant was gone, Thomas texted Pittman's phone "saying the law got [Defendant]."

*B. Law Enforcement Investigation*

In the midmorning hours of 30 January 2014, Atlantic Beach Police Lieutenant Brian Prior ("Lieutenant Prior") received a call regarding a potentially hazardous chemicals and HAZMAT situation at the Seashore Motel. Upon arrival, Lieutenant Prior made contact with Carla, who told him about the items she had discovered inside room 9.

Lieutenant Prior entered the room, and observed: (1) a 7–up two liter bottle with an unknown "red slushy residue" at the bottom; (2) plastic tubing; (3) a soda cap that had been "hollowed out" with a tube placed though the cap and secured with glue; (4) a funnel; (5) a face mask; (6) a glass jar with an unknown white powdery substance at the bottom; (7) Coleman fuel; (8) cardboard containers with salt in them; and (9) a used syringe located in the trashcan. Lieutenant Prior determined these items were consistent with items in a methamphetamine lab, based on his training and experience. Lieutenant Prior secured the room and obtained a search warrant. After the search warrant was issued, room 9 was processed by North Carolina State Bureau of Investigation ("SBI") agents.

SBI Special Agent Kelly Ferrell ("Agent Farrell") was in charge of responding to clandestine laboratories found in the eastern portion of the state as a "Site Safety Officer." Agent Farrell was called to room 9 of the Seashore Motel to process a suspected methamphetamine laboratory on 30 January 2014. Agent Farrell documented the items located in room 9.

Agent Farrell analyzed the red slushy residue found in the bottom of the 7–up bottle, which tested positive for hydrochloric acid, a precursor chemical for methamphetamine. Agent Farrell also observed a bottle of Floweasy drain cleaner, which contains sulfuric acid, and a Walgreens cold pack, which contains ammonium nitrate. Agent Farrell testified both sulfuric acid and ammonium

nitrate are precursor chemicals for methamphetamine. Agent Farrell also observed various other trappings of a methamphetamine laboratory in room 9, including: (1) masks; (2) burnt aluminum foil; (3) a hot glue gun; (4) coffee filters; (5) green rubber gloves; (6) a bottle of hydrogen peroxide; and (7) a two pack of Energizer brand batteries of advanced lithium.

Agent Farrell testified the materials found in room 9 were "typical of what [is] see[n]" at a methamphetamine lab using the "one-pot cook" method. Agent Farrell testified: (1) it took her "less than a minute" to determine the materials found in room 9 were a clandestine methamphetamine laboratory; and (2) the precursor chemicals found in room 9 were in fact used to produce methamphetamine.

Atlantic Beach Police Officer David Ennis ("Officer Ennis") arrived at the Seashore Motel and assisted Lieutenant Prior. Officer Ennis briefly looked inside room 9 and sealed off the crime scene to ensure no one entered or exited except those authorized to do so. Officer Ennis reviewed the registration card Kennon had filled out at the time of check in. Officer Ennis ran the vehicle license plate number Kennon listed on the registration card, and found the plate was issued to a Buick vehicle registered to Defendant.

While Officer Ennis remained on the scene, he noticed a gold Buick enter the Seashore Motel parking lot. Officer Ennis made contact with Defendant, the driver of the car, and asked him why he was at the motel. Defendant replied he was "just driving around."

While talking to Defendant, Officer Ennis noticed two blue pills located in "the grip of the driver's side door" handle of Defendant's vehicle. Defendant admitted the pills were Adderall, a controlled substance. Officer Ennis instructed Defendant to exit his vehicle, handcuffed him, and placed him under arrest for possession of a controlled substance. Thomas was inside the car at the time of Defendant's arrest and was also arrested on unrelated charges.

Officer Ennis performed a pat down of Defendant and a key fell "from the lower half of his body." Officer Ennis picked up and examined the key, issued to room 9 at the Seashore Motel. Defendant was transported to the Carteret County Detention Center for processing.

*C. Defendant's Indictment and Pre–Trial Motions*

Defendant was indicted with (1) possession and distribution of a methamphetamine precursor; (2) manufacturing methamphetamine; and (3) conspiracy to manufacture methamphetamine on 24 February 2014. Defendant retained counsel approximately twenty-seven days after his arrest. Defendant was represented by

8

attorney Rodney Fulcher ("Fulcher").   At some point prior to 3 September 2014, Defendant, though counsel, made a motion to continue his case, which was granted.

On 3 September 2014, Fulcher moved to withdraw as counsel.   In support of his motion, Fulcher stated "[a]s we've kind of gone along with it, I don't think [Defendant] and I see eye-to-eye on everything.   I don't think I can zealously represent him at a trial based on the evidence, the conversations we've had." Fulcher also mentioned Defendant was unable to "continue finish hiring" him.

Defendant made a statement to the court at the motion hearing.   Defendant stated Fulcher had not talked to "none of [his] witnesses" and had not obtained "none of the evidence."   Defendant stated he felt as if he was "being railroaded," and "ask[ed] for [Fulcher] to withdraw from [the] case, and we just proceed toward trial."   Defendant also stated he would need "enough time to prepare for trial, and a lawyer who's going to do the job I asked him to do."   After hearing from Fulcher, Defendant, and the State, the trial court denied both the motion to withdraw and motion to continue.

That same day, Defendant, through counsel, made an "Application and Writ of Habeas Corpus ad Testificandum" to secure the testimony of two defense witnesses, Flowers and Thomas, who were in prison in North Carolina.   On 4 September 2014, Judge Benjamin Alford issued the writ and ordered the Carteret County Sheriff to serve the writ and make Flowers and Thomas available for testimony at trial.

Defendant's case was called for trial on 8 September 2014.   Defendant made another motion to continue.   In support of his motion, Defendant stated defense witnesses were subpoenaed on 3 September 2014, and many of the subpoenas had not yet been served.   Defendant argued Flowers and Thomas were material witnesses, and Defendant would be prejudiced if they were not available to testify. The State replied "the witnesses, some of them, are in custody, and we'll get them here."   The trial court denied Defendant's motion to continue.   Defendant then made a motion to suppress the evidence found in room 9 as illegally obtained.   The trial court denied Defendant's motion to suppress.

### D. Defendant's Trial and Sentencing

Defendant's case proceeded to trial on 8 September 2014.   At the close of State's evidence, on 9 September 2014, Defendant moved to dismiss the three charges, which was denied.   The court asked if Defendant would present any witnesses or evidence, and Defendant indicated he would.   Regarding the testimony of Flowers and Thomas, Defendant's counsel stated "I do not know if Mark Thomas had been writted back or Cassie Flowers either.   But I plan to call Lisa—Richard Willis, and Anique Pittman.   All the other ones I am certain are here to testify."

Defendant then called three witnesses on his behalf: Lisa Turner, Richard Willis, and Anique Pittman. Before the closing of Defendant's evidence, the following exchange occurred between the Court and Defendant's counsel:

THE COURT: . . . Anything from the defendant?

[Defendant's Counsel]: Yes, Your Honor. We would bring a couple questions about witnesses.

THE COURT: Yes, sir.

[Defendant's Counsel]: Your Honor, if I may approach on one witness?

THE COURT: Yes.
(Discussion off the record at the bench.)

THE COURT: All right. Mr. Fulcher, you have some motion you want—

[Defendant's Counsel]: I do, Your Honor. We would—I would like to call one witness, a Brandon Elps, for the purposes of testifying to the truth of Ms. Kennon. He's over in custody in our jail. It would be limited to the fact—of testimony, that she had, in previous occasions, gotten him in trouble, went to the law on him and all that. So that would be my motion, to have him over here.

And the other two witnesses would be—and the other two would be for Cassie Flowers in the Department of Corrections, and Mark Thomas. They, too, would be witnesses to show—testify to the untruthfulness of Ms. Kennon and things that she had said and done in the past.

And I would make a motion to continue, to get those witnesses here.

THE COURT: It would appear to the Court that any writ . . . that was issued by this Court was done last Thursday, September the 4th, and the trial was scheduled—was due to start the 8th, and the person, Ms. Flowers, is not currently in the Carteret County jail and neither is Mark Thomas, is my understanding.

As to the other one, testifying about some alleged bad act of Heather Kennon at some earlier time without any connection to this case, would—this Court does not believe would have relevance to the charges for which

10

the defendant stands trial in this case, and would not grant a continuance for that.

If you want to make an offer of proof as to that—who is it that's in the Carteret County jail?

[Defendant's Counsel]: Brandon Elps.   But I don't think I can do anything other than specific instances—

THE COURT: I understand.   If you want to make an offer of proof as to that, I'll be happy to have the Sheriff bring him over.

Following this exchange, Defendant testified on his own behalf.   No other evidence or testimony or offer of proof was presented by Defendant.   The jury returned verdicts finding Defendant guilty of each of the three charges.

Warren, 244 N.C. App at 135–42, 780 S.E.2d at 837–41.

## COURT'S DISCUSSION

A.   Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).   The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."   Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).   Once the moving party has met its burden, the non-moving party must then "come forward with specific facts showing that there is a genuine issue for trial."   Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (internal quotation omitted).

The standard of review for habeas petitions brought by state inmates, where the claims have been adjudicated on the merits in the state court, is set forth in 28 U.S.C. § 2254(d).   That

11

statute states that habeas relief cannot be granted in cases where a state court considered a claim on its merits unless the decision was contrary to or involved an unreasonable application of clearly established federal law as determined by the United States Supreme Court, or the state court decision was based on an unreasonable determination of the facts. See 28 U.S.C. § 2254(d)(1)-(2). A state court decision is "contrary to" Supreme Court precedent if it either arrives at "a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite" to that of the Supreme Court. Williams v. Taylor, 529 U.S. 362, 406 (2000). A state court decision "involves an unreasonable application" of Supreme Court law "if the state court identifies the correct governing legal principle from [the Supreme] Court's cases but unreasonably applies it to the facts of the state prisoner's case." Id. at 407. A state court decision also may apply Supreme Court law unreasonably if it extends existing Supreme Court precedent to a new context where it does not apply, or unreasonably refuses to extend existing precedent to a new context where it should apply. Id. The applicable statute

> does not require that a state court cite to federal law in order for a federal court to determine whether the state court decision is an objectively reasonable one, nor does it require a federal habeas court to offer an independent opinion as to whether it believes, based upon its own reading of the controlling Supreme Court precedents, that the defendant's constitutional rights were violated during the state court proceedings.

Bell v. Jarvis, 236 F.3d 149, 160 (4th Cir. 2000), cert. denied, 534 U.S. 830 (2001). Moreover, a determination of a factual issue made by a state court is presumed correct, unless rebutted by clear and convincing evidence. See 28 U.S.C. § 2254(e)(1).

By contrast, in the event the state court does not adjudicate the merits of the petitioner's claims, and the claim is not procedurally defaulted or the respondent fails to assert procedural

default, the federal court reviews the claim de novo.   Plymail v. Mirandy, 8 F.4th 308, 316 (4th Cir. 2021); Valentino v. Clarke, 972 F.3d 560, 576 (4th Cir. 2020).

B.    Analysis

    1.    Factual Determinations

As a threshold issue, respondent argues that petitioner fails to show that the MAR court's factual determinations were clearly and convincingly wrong.   (Resp't Mem. in Supp. (DE 10) at 10).   The court agrees.   Petitioner contends the MAR court made unreasonable factual determinations regarding the following factual findings: 1) the state had a strong circumstantial case against petitioner even if the testimony of his co-defendant, Kennon, was totally discredited, (Pet. (DE 1) at 30); 2) the recounting of Thomas's testimony that the night of the January 29, 2014, consisted of an "all-night drug party," (id. at 31); 3) the bridge was closed all night due to weather, (id. at 31–32); and 4) petitioner's trial attorney, Fulcher, believed the testimony of witnesses Thomas and Flowers would be unhelpful and made the strategic decision not to call them, (id. at 33–34).

The court begins with petitioner's argument that the state did not have a strong circumstantial case against petitioner, withstanding Kennon's testimony, and in fact, the trial court would not have had sufficient evidence to convict.   (See id. at 30).   In support, petitioner notes he denied any knowledge of the contents of the motel room rented under Kennon's name; Kennon signed a cooperation agreement with the state and testified in exchange for a lesser sentence; and female sanitary products were found in close proximity to the chemicals and paraphernalia.   (Id. at 30).   However, the record indicates, the manager and assistant manager of the Seashore Motel saw petitioner when Kennon paid for the room, (Trial Tr. (DE 1-3) at 74:14 to 75:5, 101:9 to

13

102:21), and Kennon marked that two people were staying in the room, (id. at 75:6 to 77:7). The manager did not see anyone else near petitioner and Kennon's motel room (id. at 80:2 to 80:6), and petitioner refused blankets offered by him through the cracked door of the room, (id. at 79:11 to 80:4). After police found the meth lab, petitioner arrived at the motel, and the only key to the room fell out of his pocket as police arrested him. (Id. at 211:23 to 212:15). Accordingly, there was strong circumstantial evidence to convict petitioner of the relevant charges.

The court next turns to the MAR court's use of the phrase "all-night drug party" to describe Thomas's testimony regarding his stay at Pittman's home the night of January 29, 2014. (See MAR Tr. (DE 1-13) at 21:21 to 22:20).[4] Petitioner maintains Thomas did not describe an "all-night drug party" but instead consumed drugs discreetly and alone. (See Pet. (DE 1) at 31). Petitioner also notes that Pittman testified she did not see Thomas doing drugs that night. (Trial Tr. (DE 1-3) at 310:11 to 312:5). However, Thomas testified he smoked marijuana and methamphetamine with Kennon. (MAR Tr. (DE 1-13) at 32:17 to 33:25). This is to what the MAR court was referring when it stated Thomas and Kennon engaged in an "all-night drug party." (MAR Ord. (DE 1-14) at 7). Such a description is not clearly and convincingly wrong.

Regarding the MAR court's determination that the bridge was close the night of January 29, 2014, petitioner argues Flowers' testimony regarding the bridge closure did not directly contradict Pittman and Thomas's testimonies regarding the bridge closure. (Pet. (DE 1) at 31). At the MAR hearing, Thomas testified that he believed the bridge was closed from 6:00 p.m. to

---

[4]    The trial court conducted two separate MAR hearings. (See First MAR Tr. (DE 1-12); MAR Tr. (DE 1-13)). Because a new state court judge was appointed to the case subsequent to the first hearing, the new judge conducted a second hearing in order to properly assess credibility and other matters. (See generally MAR Tr. (DE 1-13)). Because the MAR court relied solely on the second hearing, the court here cites only to the second hearing. (See MAR Ord. (DE 1-14) at 1099–1107).

6:00 a.m., and Flowers testified the bridge was closed the whole day. (MAR Tr. (DE 1-13) at 41:21–25, 62:4–6). At trial, Pittman testified she had crossed the bridge prior to its closure to pick up Thomas. (Trial Tr. (DE 1-3) at 331:16–22). The MAR court was merely pointing out inconsistencies that would show there was not a reasonable probability that Flowers's testimony at trial would have changed the outcome. Petitioner has not shown by clear and convincing evidence that such a determination was incorrect.

Lastly, the court considered petitioner's argument that the determination that Fulcher believed the testimonies of Thomas and Flowers was unhelpful and made the strategic decisions was unreasonable. (Pet. (DE 1) at 33). At trial, Fulcher requested a continuance asserting that Thomas and Flowers were material witnesses, and it would prejudice petitioner's case if they were not present. (Trial Tr. (DE 1-3) at 7:8–20). The prosecutor responded that they were in custody and the state would transport them to court. (Id. at 7:21–24). At the MAR hearing, Fulcher explained that, because of past drug charges, he believed calling them as witnesses would be "disastrous." (MAR Tr. (DE 1-13) at 138:1–17). Fulcher further testified that, had Thomas and Flowers been transported to the court, he would not have called them. (Id. at 168:17–22). When requesting their presence, he was trying to appease petitioner's wants. (Id. at 168:23 to 169:18). Accordingly, petitioner has not shown that such a determination was not clearly and convincingly wrong.

### 2. Ineffective Assistance of Counsel

The court now turns to petitioner's ineffective assistance of counsel claims. Petitioner argues his trial attorney was ineffective where he failed to interview and secure attendance of defense witnesses, specifically Thomas and Flowers. (Pet. (DE 1) at 24, 26). Petitioner further

15

contends that the MAR court's finding that Fulcher was not ineffective is an unreasonable

application of Strickland v. Washington, 466 U.S. 688, 687 (1984). The MAR court denied

petitioner's ineffectiveness claims stating:

> [Petitioner] believes that Fulcher lost interest in the case once paid and that he did
> not talk to potential witnesses, analyze evidence or collect exculpatory evidence
> like videos from the motels.
>
> . . .
>
> [Petitioner] told Fulcher about the potential testimony of Elps, Roberts, Flowers
> and Thomas; however Fulcher did not interview them; he did not have Elps brought
> from the jail to make an offer of proof; he did not seek to delay the trial when
> Flowers and Thomas had not been transported from prison to testify.
>
> . . .
>
> []Fulcher did not interview Elps, Thomas, or Flowers; [petitioner] did want them
> to testify which is why he tried to secure their appearance in court; however, even
> if they were there[,] he would not have called them.
>
> [Fulcher] was familiar with Elps'[s] criminal history and even if his testimony
> [was] admissible he did not believe Elps would be credible.
>
> [Fulcher] was familiar with the criminal backgrounds of Thomas and Flowers as
> well as the fact that both were then in prison; he did not consider either to be
> credible witnesses; he had interviewed Pittman and knew that she would testify to
> many of the same matters as Thomas and did not believe it to be in [petitioner's]
> bet interest to call these witnesses. He believed that Pittman would be a stronger
> witness due to her lack of an extensive criminal record.
>
> []Although he did not interview Thomas or Flowers he made a strategic decision
> not to call these witnesses largely because of their criminal history and effect it
> would have on their credibility.
>
> [Petitioner] did not present the testimony of Elps or Roberts at either evidentiary
> MAR hearing. It is therefore impossible to say that had they testified at trial there
> was a reasonable probability of a different outcome.
>
> []Had Thomas testified at trial his testimony would have partially corroborated that
> of Kennon and directly contradicted Pittman's. Pittman denied that there was any
> drug activity at her condo whereas both Thomas and Kennon described an all night

16

drug party. Hence it is likely that his testimony would have strengthened the State's case and weakened that of the defense. There is not a reasonable probability that his testimony at trial would have resulted in a different outcome.

[]As noted above, because of her feigned inability to remember a single person who supplied her drugs, the Court finds that Flowers'[s] testimony is not credible. However had she testified she would have directly contradicted Pittman and Thomas who testified to crossing the Atlantic Beach Bridge in coming from Newport to the Pittman condo; according to Flowers the bridge was closed at all relevant times. There is not a reasonable probability that her testimony at trial would have resulted in a different result.

(MAR Ord. (DE 1-14) at 6–7).

In order to establish ineffective assistance of counsel, a petitioner must satisfy a two-pronged test. See Strickland, 466 U.S. at 687. Under the first prong, a petitioner must show that his counsel's representation "fell below an objective standard of reasonableness." Id. at 688. The court must be "highly deferential" to counsel's performance and must make every effort to "eliminate the distorting effects of hindsight." Id. at 689. Therefore, the court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. "Decisions about what types of evidence to introduce are ones of trial strategy, and attorneys have great latitude on where they can focus the jury's attention and what sort of mitigating evidence they can choose not to introduce." Wilson v. Greene, 155 F.3d 396, 404 (4th Cir. 1998) (quotation marks and citations omitted). The second prong requires a petitioner to prove that he was prejudiced by the ineffective assistance by showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

In this case, as noted above, Fulcher testified at the MAR hearing that Thomas and Flowers had past drug charges similar to those petitioner was being tried for and calling them as witnesses

17

would be "disastrous." (MAR Tr. (DE 1-13) at 138:1–17). Had Thomas and Flowers been transported to the court, Fulcher testified he would not have called them. (Id. at 168:17–22). He further noted that Pittman testified to many of the matters that Thomas and Flowers would. (Id. at 138:18–22). Fulcher's strategic decision not to call Thomas and Flowers as witnesses was based on his reasonable professional judgment, informed by his knowledge of their criminal histories, the facts of petitioner's criminal case, and the availability of Pittman as a witness. Accordingly, the first prong of Strickland is not met.

Regarding Elps and Roberts, petitioner did not call them to testify at the MAR hearing, and thus he cannot show their testimony at trial would have produced a different outcome. (See MAR Ord. (DE 1-14) at 7). Petitioner has also not shown that, had Fulcher called Thomas and Flowers, petitioner would have been found not guilty. Therefore, petitioner has also not established the second prong of the Strickland.

Accordingly, the MAR court's adjudication of this claim was not contrary to or an unreasonable application of clearly established federal law, and the court grants respondent's motion for summary judgment as to this claim.

3.     Procedural Default

Respondent argues petitioner has procedurally defaulted on his claim that the following ruling by the North Carolina Court of Appeals was legally and factually unreasonable violating petitioner's right to a defense: "The trial court did not abuse its discretion in denying [petitioner's] motion to continue immediately prior to trial. This argument is overruled. [Petitioner] failed to obtain a ruling by the trial court on his motion to continue immediately prior to his testimony. We dismiss this argument as unpreserved." Warren, 244 N.C. App. at 151, 780 S.E.2d at 846.

18

Petitioner did not present the issue of the denial of the motion to continue immediately prior to his testimony to the North Carolina Supreme Court. (See Pet. Brief for Discretionary Review (DE 1-7) at 3–4). Although petitioner presented the issue of the denial of a continuance prior to trial to the North Carolina Supreme Court, (id. at 3), he did not present the issue to the MAR court, (see MAR (DE 1-10) at 7).

Absent a valid excuse, a state prisoner must exhaust his remedies in state court before seeking federal habeas corpus relief. See 28 U.S.C. § 2254(b). To exhaust available state court remedies, a petitioner must "fairly present[ ] to the state court both the operative facts and the controlling legal principles associated with each claim." Longworth v. Ozmint, 377 F.3d 437, 448 (4th Cir. 2004) (internal quotation omitted). Section 2254's exhaustion requirement demands that state prisoners give "the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999). This "one full opportunity" includes filing petitions for discretionary review with the state supreme court when that review is part of the ordinary appellate procedure in the state. See id. A habeas petitioner has the burden of proving that a claim is exhausted. Mallory v. Smith, 27 F.3d 991, 994 (4th Cir. 1994).

In North Carolina, a petitioner may satisfy § 2254's exhaustion requirement by directly appealing his conviction to the North Carolina Court of Appeals and then petitioning the Supreme Court of North Carolina for discretionary review, or by filing an MAR and petitioning the North Carolina Court of Appeals for a writ of certiorari. See N.C. Gen. Stat. §§ 7A-27, 7A-31, 15A-1422. An MAR shall be denied if "[u]pon a previous motion made pursuant to [Article 89, MAR and Other Post-Trial Relief], the defendant was in a position to adequately raise the ground

19

or issue underlying the present motion but did not do so" or "[u]pon a previous appeal the defendant was in a position to adequately raise the ground or issue underlying the present motion but did not do so."   N.C. Gen. Stat. § 15A-1419(a)(1), (3).

A claim that has not been adequately presented to the state courts may be treated as exhausted if it is clear that the claim would be procedurally barred under state law if the petitioner now attempted to present it.   Baker v. Corcoran, 220 F.3d 276, 288 (4th Cir. 2000); Breard v. Pruett, 134 F.3d 615, 619 (4th Cir. 1998).   A federal habeas court may not review such claims because the state procedural bar provides an adequate and independent state law ground for the conviction and sentence, unless the petitioner can show cause and prejudice or a fundamental miscarriage of justice to excuse the default.   Plymail, 8 F.4th at 316; Baker, 220 F.3d at 288 (citing Gray v. Netherland, 518 U.S. 152, 161 (1996)).   To establish cause, a petitioner must show something external to the petitioner prevented him from complying with the state procedural rule. Coleman v. Thompson, 501 U.S. 722, 753 (1991).   To show prejudice, a petitioner must show he was actually prejudiced as a result of the alleged violation of federal law.   United States v. Frady, 456 U.S. 152, 168 (1982).

As noted by respondent, petitioner failed to seek discretionary review of the claim that his rights were violated when the trial court denied his motion to continue prior to his testimony.   (See Pet. Brief for Discretionary Review (DE 1-7) at 3-4.   Petitioner argues that he could not properly seek discretionary review of the issue because the North Carolina Court of Appeals dismissed the claim for failure to preserve refusing to consider the claim.   (Pet. (DE 1) at 38-39.   However, also as noted by respondent, petitioner failed to include both claims in his MAR.   (See MAR (DE 1-10) at 7).   Where the foregoing claims were not presented to the state court in his original MAR,

he is barred from presenting them in a subsequent MAR.  See N.C. Gen. Stat. § 15-1419(a)(1);

see also Bacon v. Lee, 225 F.3d 470, 476 (providing that § 15-1419(a)(1) "constitutes an independent and adequate state ground that may give rise to procedural default of federal habeas claims").  Thus, these claims are procedurally defaulted and unreviewable in federal court absent a showing of cause and prejudice or a fundamental miscarriage of justice.  Petitioner has not put forth any facts establishing cause, prejudice, or a or a fundamental miscarriage of justice sufficient to excuse his procedural default.

Accordingly, there is not genuine issue of material fact, and respondent is entitled to judgment as a matter of law.

C.      Certificate of Appealability

Rule 11 of the Rules Governing Section 2254 Cases ("Habeas Rules") provides "the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  Having determined petitioner is not entitled to relief and respondent is entitled to dismissal of the petition, the court considers whether petitioner is nonetheless entitled to a certificate of appealability with respect to one or more of the issues presented in his habeas petition. A certificate of appealability may issue only upon a "substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  Where a petitioner's constitutional claims have been adjudicated and denied on the merits by the district court, the petitioner must demonstrate reasonable jurists could debate whether the issue should have been decided differently or show the issue is adequate to deserve encouragement to proceed further.  Miller-El v. Cockrell, 537 U.S. 322, 336-38 (2003); Slack v. McDaniel, 529 U.S. 473, 483-84 (2000).

21

After reviewing the claims presented in the habeas petition in light of the applicable standard, the court finds reasonable jurists would not find the court's treatment of any of petitioner's claims debatable or wrong and none of the issue are adequate to deserve encouragement to proceed further. Accordingly, a certificate of appealability is denied.

## CONCLUSION

Based on the foregoing, respondent's motion for summary judgment (DE 8) is GRANTED. The petition is DISMISSED with prejudice, and a certificate of appealability is DENIED. The clerk is DIRECTED to close this case.

SO ORDERED, this the 29th day of March, 2022.

LOUISE W. FLANAGAN
United States District Judge

Case 5:20-hc-02206-FL   Document 27   Filed 03/29/22   Page 22 of 22